# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Cathy L. Waldor |
| | : | |
| v. | : | Mag. No. 15-7140 |
| | : | |
| NICHOLAS LATTANZIO | : | CRIMINAL COMPLAINT |
| | : | |
| | : | |

I, Stephanie Davis, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent of the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Stephanie Davis, Special Agent
Federal Bureau of Investigation

Sworn to before me, and
subscribed in my presence

June 9, 2015 at
Newark, New Jersey

HONORABLE CATHY L. WALDOR
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

## ATTACHMENT A

### Counts 1 through 3
### (Wire Fraud)

From at least as early as in or around June 2013 through in or around November 2014, in the District of New Jersey and elsewhere, defendant

## NICHOLAS LATTANZIO

knowingly and intentionally devised a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate commerce the following writings, signs, signals, and sounds, each constituting a separate count of this Complaint:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 1 | December 27, 2013 | Wire transfer of approximately $124,000 sent from LATTANZIO to a Land Rover dealership in or around Paramus, New Jersey for the purchase of a car |
| 2 | August 21, 2014 | Wire transfer of approximately $1.95 million sent from Company B's bank account to a brokerage account controlled by LATTANZIO in New Jersey |
| 3 | August 21, 2014 | Wire transfer of approximately $1,048,956 sent from an account controlled by LATTANZIO to a title company in New Jersey in connection with the purchase of a home in or around Upper Montclair, New Jersey |

In violation of Title 18, United States Code, Section 1343 and Section 2.

**Count 4**
**(Securities Fraud)**

In or about December 2013, in the District of New Jersey and elsewhere, defendant

**NICHOLAS LATTANZIO**

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, knowingly and willfully used manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5 in connection with the purchases and sales of securities, to wit, interests in the Black Diamond Capital Appreciation Fund, L.P., by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, namely, a purchaser of a limited partnership interest in the Black Diamond Capital Appreciation Fund, L.P.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## Count 5
### (Securities Fraud)

In or about August 2014, in the District of New Jersey and elsewhere, defendant

### NICHOLAS LATTANZIO

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, knowingly and willfully used manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5 in connection with the purchases and sales of securities, to wit, securities purchased and managed by Black Diamond Investments, LLC, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## ATTACHMENT B

I, Stephanie Davis, a Special Agent with the Federal Bureau of Investigation, having conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts which I believe are necessary to establish probable cause. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part.

## BACKGROUND

1.      At all times relevant to this Complaint:

a.      Defendant NICHOLAS LATTANZIO was a resident of Montclair, New Jersey. LATTANZIO controlled and was the principal of the following entities: Black Diamond Capital Appreciation Fund, L.P. ("BD Fund"); Black Diamond Investments, LP ("BD Investments"); and Black Diamond GP, LLC ("BD GP") (collectively, the "Black Diamond Entities").

b.      BD Fund was a Delaware limited partnership with its principal place of business located in or around Montclair, New Jersey. The BD Fund claimed to be an investment entity that purportedly invested in highly-liquid fixed-income instruments using proprietary investment strategies.

c.      BD Investments was a New Jersey limited partnership with its principal place of business in or around Montclair, New Jersey. BD Investments purported to be the investment advisor to the BD Fund.

d.      BD GP was a New Jersey limited partnership with its principal place of business in or around Montclair, New Jersey. BD GP purported to be the general partner to the BD Fund.

e.      "Company A" was a Delaware corporation with its principal place of business located in or around New York, New York. Company A was engaged in the business of oil and gas operations, production, development and acquisitions. Among other things, Company A invested in small, under-capitalized oil and gas reserves in the United States, and often sought various sources of financing to fund its acquisitions and development of such assets.

f.      "Company B" was a Georgia limited liability company with its principal place of business located in or around Atlanta, Georgia. Among other things, Company B was engaged in the business of developing hotels.

1

g.      "Individual 1" was associated with a purported lending company located in or around Southport, Connecticut (the "Lending Company"). The Lending Company purported to market large credit facilities, including those allegedly provided by the Black Diamond Entities.

## THE ADVANCE FEE SCHEME

2.      From at least as early as in or about June 2013 through in or about November 2014, LATTANZIO orchestrated a large-scale advance fee scheme pursuant to which he, through the BD Entities, collected millions of dollars in upfront fees from unsuspecting investors in exchange for the promise of future loans or investment opportunities that did not materialize. Instead of investing the victims' monies and providing the loans as promised, LATTANZIO misappropriated the majority of the funds for his personal use, including to buy a million dollar home, a luxury vehicle, expensive jewelry, and to pay off hundreds of thousands of dollars in credit card debt that he incurred for other personal expenses. The credit card expenditures included over $24,000 for a family trip to Hawaii, over $50,000 for tickets to the New York Yankees, and thousands of dollars in clothes, restaurants, jewelry and furniture. LATTANZIO did not disclose these diversions of funds to victim investors and instead made numerous misrepresentations to the victim investors to mislead them into believing that their investments were safe. During the time period of the scheme, LATTANZIO defrauded investors of approximately $4 million.

### LATTANZIO Defrauds Company A

3.      In or about June 2013, Company A began seeking sources of external funding to develop its existing assets and to acquire additional assets. During that process, in or about October 2013, Company A was introduced to the Lending Company. At the time, the Lending Company's principal, Individual 1, offered Company A a "Reserve Based Lending" opportunity. Specifically, Individual 1 advised Company A that the Lending Company could arrange a $20 million credit facility for Company A through another entity (the "Lending Facility").

4.      As a prerequisite to obtaining access to the Lending Facility, however, Individual 1, acting at the direction of LATTANZIO, informed Company A that it first needed to deposit $2 million with the Black Diamond Entities. In subsequent conversations prior to any exchange of funds, LATTANZIO and Individual 1 made the following misrepresentations, among others, to Company A concerning the Lending Facility and the $2 million deposit:

a. The Lending Facility was all but guaranteed;

b. The $2 million deposit would be invested with the Black Diamond

2

Entities and would entitle Company A to a limited partnership interest in the BD Fund, a successful hedge fund managed by LATTANZIO;

c. Company A would be one of many investors in the BD Fund, which had a five-year track record of steady earnings; and

d. If, however, the Lending Facility (or an alternate facility) failed to close within 120 days, Company A could withdraw the $2 million deposit from the BD Fund.

5.      Among other documents, in or about December 2013, LATTANZIO, through BD GP, entered into a Letter of Understanding ("LOU") with Company A that outlined the key terms of the contemplated transaction, including Company A's right to withdraw its $2 million deposit in the event that the Lending Facility was not finalized within 120 days of the deposit being made.

6.      Based on the above misrepresentations, among others, on or about December 9, 2013, a representative of Company A signed a subscription agreement with the BD Fund under which Company A purchased a limited partnership interest in the BD Fund for $2 million.  Thereafter, on or about December 20, 2013, Company A caused $2 million to be wired to the Black Diamond Entities in New Jersey.

7.      Contrary to the representations that LATTANZIO and others made to Company A, Company A's funds were not held as an escrowed deposit/investment in the BD Fund.  Rather, LATTANZIO converted the majority of the funds to his own use or used the funds in a manner that was inconsistent with the representations made to Company A.  Moreover, LATTANZIO did not disclose the diversion of funds to Company A.

8.      For example, within days of receiving Company A's funds, LATTANZIO wired approximately $124,000 to the bank account of a Land Rover dealership for the purpose of purchasing a luxury car.

9.      During the same time period, LATTANZIO transferred funds to a personal checking account and then wrote checks from that account to make purchases for personal items.  For instance, on or about December 23, 2013, LATTANZIO wrote a check for $102,185 to a luxury jewelry store in or around Hackensack, New Jersey to purchase a platinum and diamond ring that included a bezel set with three separate brilliant cut diamonds that each weighed over one carat.

10.      Over the next several months, and continuing through in or around April 2014, however, LATTANZIO and others acting at his direction sent numerous false and misleading emails to Company A and its representatives

3

stating the closing of the Lending Facility was imminent, and falsely leading
Company A to believe that its escrow deposit was secure. When it became
apparent to Company A that the closing was not going to take place as
LATTANZIO had represented, it asked for the return of its $2 million deposit.
Thereafter, LATTANZIO made multiple excuses to conceal his misappropriation
of the funds and to continue to mislead Company A into believing that its
money was securely invested with the BD Fund.

### Examples of False and Misleading Communications

    11.    Throughout the course of the above events, LATTANZIO and others
acting at his direction consistently made false and misleading statements to
Company A through email and other communications to induce it to make the
initial deposit, and then to cover up the fraud and lead Company A to believe,
incorrectly, that its money was safe and being used as planned. Below are
several examples of these communications.

    a.    On or about April 3, 2014, Individual 1 responded to an
email inquiry from a representative of Company A concerning the status
of the Lending Facility and Company A's funds. Individual 1 stated,
among other things, "[LATTANZIO] is the fund manager (Black Diamond)
for the deposit," that he had "been advised that everything that we need
to close will be in the lawyers escrow in 7-10 banking days," and that "If
[Company A was] not willing to provide the time necessary… they can
always take their money back as per the contract and [the lending entity]
will use the loan proceeds to fund a different project."

    b.    In or around June 2014, one of Company A's representatives
sent LATTANZIO a series of emails requesting copies of further
documentation of the parties' agreement regarding Company A's ability
to redeem its $2 million escrow deposit if it did not receive funding within
120 days. On or about June 20, 2014, LATTANZIO sent the
representative an email that purported to attach the requested
documentation agreed to by the parties. The document LATTANZIO
provided, however, was different from that referenced in the initial LOU
and did not include reference to the 120 day provision. When questioned
about the exclusion of the 120 day provision, LATTANZIO wrote: "There
is no need to mention [the 120 days] in the side letter since we are now
beyond the 120 days."

    c.    In other communications on or about September 3, 2014,
Company A's representative pressed LATTANZIO for statements
concerning the fact that Company A had received nothing from the Black
Diamond Entities regarding the performance of its $2 million deposit.
LATTANZIO replied in an email as follows: "You are correct. I apologize
for the oversight, but I want to refresh your memory that you are getting

4

paid 5% interest rate regardless of how the funds are performing." Company A then requested from LATTANZIO statements reflecting the performance of its deposit funds and LATTANZIO agreed to provide them.

      d.     Between on or about September 18, 2014, and on or about September 19, 2014, a Company A representative exchanged additional emails with LATTANZIO concerning the documentation related to the performance of Company A's $2 million deposit, and LATTANZIO replied as follows: "I will have a nav [(Net Asset Valuation)] shortly."

      e.     On or about September 18, 2014, LATTANZIO sent a Company A representative an email stating that the parties' subscription agreement prevented Company A from redeeming any money from the BD Fund prior to January 2015, but that LATTANZIO would inquire with the BD Fund's administrator concerning early redemption. In a later exchange with Individual 1, Company A was told that if it redeemed its money from the BD Fund prior to January 2015, it would do so at a "loss."

      12.    To date, Company A has not received back any of its $2 million deposit or interest earned in connection with the deposit, and has not received any records relating to the alleged performance of the funds through the BD Fund. In reality, bank records confirm that LATTANZIO converted the majority of Company A's $2 million to his own benefit, including using the funds to pay private school tuition fees, golf club membership dues, credit card bills, and to purchase a luxury vehicle, among other things.

**LATTANZIO Defrauds Company B**

      13.    In or around the spring/summer of 2014, Company B was seeking financing to develop a hotel project in Georgia. In or about June 2014, Company B was introduced to LATTANZIO and Individual 1.

      14.    Thereafter, LATTANZIO and Individual 1 advised Company B of the Black Diamond Entities' loan requirements, which were similar to those discussed above in connection with the Company A fraud. According to LATTANZIO and Individual 1, the Black Diamond Entities would provide Company B with approximately $8.625 million in financing through an unidentified third-party lender. In order to obtain this financing, however, Company B would first have to make an equity deposit with the BD Fund in the amount of approximately $1.9 million. LATTANZIO and Individual 1 subsequently increased the required equity deposit amount to $1.95 million in exchange for purportedly increasing financing to Company B to $9.75 million. Importantly, LATTANZIO or others acting at his direction represented to Company B that if the financing did not come through within 90 days, Company B could immediately withdraw its deposit with the BD Fund.

15.     Among other representations, in fall 2014, LATTANZIO and Individual 1 provided Company B with documentation that the BD Fund's assets were invested by LATTANZIO, the general partner of the fund, and another individual, the fund's chief investment officer (the "CIO"). LATTANZIO and Individual 1 also represented that: the BD Fund had $100 million under management; it was capable of managing up to $1 billion without adding additional staff or equipment; the CIO would be responsible for all investment and hedging decisions; the fund had average annual returns of 18% since 2008; Company B would have online access to the BD Fund's account activity among other periodic information; and Company B's funds would be held in identified government securities or bank certificates of deposit. These representations were demonstrably false in that the BD Fund did not have $100 million under management, Company B's deposit was not invested in the BD Fund but was largely converted by LATTANZIO for his personal use, and Company B was not given access to the BD Fund's purported account activity.

16.     On or about July 30, 2014, Company B signed an "Investment Management Agreement" with "Black Diamond Investments, LLC," another entity that LATTANZIO owned and controlled. The Investment Management Agreement purported to govern Black Diamond Investments' management of Company's B funds, and stated that the funds would be invested in "one of two ways or a blending of both" Specifically, the Investment Management Agreement stated that Company B's funds "would be held in investment grade fixed income financial instruments as a riskless principal" or, under the second strategy, Black Diamond Investments would "invest in callable and non-callable Triple A rated debt obligations of the U.S. Treasury and the U.S. Agencies, including Fannie Mae, Freddie Mac, the Federal Home Loan Bank System and the Federal Farm Credit Banks[.]"

17.     On or about August 21, 2014, based on the above representations from LATTANZIO, Company B caused approximately $1.95 million to be wired to an account for the BD Fund in New Jersey.

18.     Contrary to the above referenced representations to Company B concerning its escrow deposit and the Black Diamond Investments' management of those funds, LATTANZIO immediately converted the funds to his own use in the following ways, among others:

    a.     On or about August 21, 2014, LATTANZIO caused a wire in the amount of approximately $19,500 to be sent to Individual 1;

    b.     On or about August 21, 2014, LATTANZIO caused a wire for approximately $1,048,956 to be sent to an escrow company in connection with LATTANZIO's purchase of a home located at 309 Upper Mountain Avenue, Montclair, New Jersey (the "Montclair Home"). The

Montclair Home is designated as Lot 41, Block 603 on the Tax Map for the Township of Montclair. The total purchase price of the Montclair Home was $1,150,000. LATTANZIO had wired a deposit of $110,000 to a law firm in New Jersey on or about June 9, 2014 in connection with the purchase of the Montclair Home, and the $1,048,956 wire transfer noted above represented the approximate balance due. According to publicly available records, the deed to the Montclair Home was transferred to the "Nicholas Lattanzio 2014 Family Trust" on or about August 18, 2014.

      c.    Between on or about August 25, 2014, and on or about September 17, 2014, there were 5 transfers totaling approximately $301,200 to bank accounts associated with other Black Diamond Entities, and the funds were then used to pay American Express bills totaling approximately $60,379.05, college tuition in the approximate amount of $24,000, and to fund checks to LATTANZIO totaling approximately $110,000, and Black Diamond Investment LP for approximately $100,000.

19.    Over subsequent months following Company B's deposit, LATTANZIO employed a number of delay tactics and made additional misrepresentations to Company B to conceal his actions with respect to its deposit funds, and to falsely lead Company B to believe that its funds were being used in the manner that LATTANZIO had represented. Ultimately, when it became apparent to Company B that there was no funding forthcoming, it demanded the return of its escrow deposit, which LATTANZIO has refused to return to date.

**FORFEITURE ALLEGATIONS**

1.     The allegations contained in all paragraphs of Counts 1 through 5 of this Complaint are hereby realleged and incorporated by reference for the purpose of noticing forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     The United States hereby gives notice to the defendant charged in Counts 1 through 5 of this Complaint that, upon conviction of the offenses charged in those counts, the government will seek forfeiture, in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any and all property, real or personal, that constitutes or is derived from proceeds traceable to the violations of Title 18, United States Code, Section 1343, alleged in Counts 1 through 3 of this Complaint, and violations of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, alleged in Counts 4 and 5 of this Complaint, including but not limited to the following properties:

     a. all right, title, and interest, including all appurtenances and improvements thereon, in the real property known as 309 Upper Mountain Avenue, Montclair, New Jersey 07042;

     b. one 2013 BMW 650, VIN: WBA6B4C56DD098465; and

     c. various jewelry consisting of: (i) one platinum and diamond ring, bezel set with one round brilliant cut diamond weighing 1.07 carats, one round brilliant cut diamond weighing 1.08 carats and one round brilliant cut diamond weighing 1.06 carats; (ii) one large, 18k white gold bangle bracelet with round brilliant cut diamonds, 1.65 carats total weight; and (iii) one rose-colored metal wrist cuff.

3.     If by any act or omission of the defendant, any of the property subject to forfeiture described in paragraph 2 herein:

     a. cannot be located upon the exercise of due diligence;
     b. has been transferred or sold to, or deposited with, a third party;
     c. has been placed beyond the jurisdiction of the court;
     d. has been substantially diminished in value; or
     e. has been commingled with other property which cannot be subdivided without difficulty;

then the United States of America will be entitled to forfeiture of substitute property up to the value of the property described above in paragraph 2, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).