# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**NICHOLAS LATTANZIO,**<br>        **Defendant.** | Crim. No. 15-446 (KM)<br><br>**MEMORANDUM OPINION**<br>**AND ORDER** |

This matter comes before the Court on the motion of the defendant, Nicholas Lattanzio, to dismiss the Indictment based on the government's destruction of evidence (ECF no. 37). The motion will be denied.

## I.    Background

The government proffered (*see* ECF no. 42) that Google, in response to a warrant, produced a thumb drive to the FBI containing copies of emails (the "Google Production"). A copy of the Google Production in its original form was not archived, backed up, or otherwise preserved. A filter agent then reviewed the emails and removed items that might have involved attorney-client communications. A subset of the records produced by Google was forwarded to the United States Attorney's Office. The USAO produced them in discovery, incorrectly believing that they represented the entirety of the Google production to the FBI. The USAO later learned that this was not accurate, and sought to obtain the remaining emails from the FBI. Some, but apparently not all, were found. The USAO informed defense counsel of the problem in a letter dated January 11, 2017. The USAO obtained a second production of subscriber and other data from Google, which it has turned over in discovery.

I concluded, based on that proffer, that I could not decide the defendant's motion without the benefit of a factual record. On July 6, 2017, I convened an evidentiary hearing.[1]

At the hearing, the Court heard the testimony of three government witnesses: Special Agents Gregory Yankow, Michelle Pickels, and Brian Herron. Some fourteen government exhibits were received in evidence. The defense did not introduce any testimony or exhibits.

In connection with the hearing, the government served on Mr. Lattanzio a Rule 17(c) subpoena seeking certain records from two email accounts. Lattanzio moved to quash the subpoena, primarily based on his Fifth Amendment privilege. At the end of the hearing, learning that Mr. Lattanzio would not testify, I orally granted the motion to quash.

I granted leave to file post-hearing briefs. Each side filed a brief on July 26, 2017 (ECF nos. 64, 65), and on July 28, 2017, the government filed a short letter (ECF no. 66) purporting to correct one of defense counsel's references to the record.

## II.     Factual Findings

The only testimony and exhibits at the hearing were introduced by the government. The defendant cross-examined, but proffered no testimony or exhibits in evidence.

### A.     Special Agent Yankow

The key witness was the initial lead case agent, SA Gregory Yankow. (Yankow was at first the sole lead case agent, but later was joined by co-case agent Stephanie Davis.) He was assigned to a white collar crime squad in Newark. It was Yankow's admitted failure to adhere to FBI procedures that resulted in the loss of email evidence.

In February 2015, the FBI obtained warrants to search the contents of two email accounts associated with Mr. Lattanzio:

---

[1]     An expedited copy of the transcript of the hearing is attached to Mr. Lattanzio's post-hearing brief. (ECF no. 64-2) It is cited herein as "Tr. _" The exhibits, all government exhibits as it happens, are designated "Ex. G1", "Ex. G2," etc.

nlaatanzio@bdinvestmentslp.com and NLLattanzio@gmail.com. (Tr. 44:15–45:3; Ex. G1) On March 19, 2015, Google responded by sending the Google Production under a cover letter addressed to Yankow. (Ex. G2) The data arrived in the form of a USB drive, colloquially known as a "thumb drive" or "flash drive." (*Id.*)

Yankow acknowledged that his unaided memory of how he handled the Google Production was not specific. Based on his review of emails and other documents, however, he testified credibly that the files from the Google Production were loaded onto his FBI laptop computer by someone in the IT department.

The original Google Production, however, was not properly documented in the file or preserved, a task that would have been Yankow's responsibility. (Tr. 48:12–50:4) FBI protocol would have been to preserve the original production and maintain it. (Tr. 50:4, 50:16–21, 50:25, 58:25–59:5) Indeed, this was Yankow's own usual practice. (*See* Tr. 43:1, 61:18–20, 62:17) Yankow acknowledged that he was responsible for preserving the original evidence, but failed to do it. (Tr. 50:19–21) He believed that this was the first time in his fifteen year career that he was guilty of such a lapse. (Tr. 62:17)

SA Yankow does not know the location of the original Google Production thumb drive. (Tr. 75:13–15)[2]

SA Yankow did not recall reviewing a single email from the Google Production, whether initially (Tr. 65:20–66:1), or even later on (Tr. 68:4–14, 73:16–24, 82:18–83:1). At no time did SA Yankow ever see any emails that he considered exculpatory of Mr. Lattanzio. (Tr. 51:9–19, 59:12)

Very early in the document review process, either Yankow or one of the other agents learned that there were email communications that appeared to involve attorneys. (Tr. 51:23–52:8) The procedure in such a case would have been to notify the U.S. Attorney's Office and to make arrangements for a "taint"

---

[2] There was a reference on cross-examination to a thumb drive that he delivered to SA Allen, but there was no evidence that this was the same thumb drive supplied by Google. (Tr. 77:3–78:11)

or "filter" team to prescreen the emails for privileged material. (Tr. 52:13–53:7) That "filter" process was put in place in late April or early May 2015.[3] (Tr. 52:4–8, 53:11; *see also* Tr. 68:4–11) During the filtering process, Yankow relinquished control of the data, and did not have access to it. (Tr. 53:20–54:1; *see also* Tr. 66:19–67:11) The filter agent seemingly worked from a laptop copy of the data, not the original Google Production itself. It cannot now be determined whether the filter agent's working copy of the data encompassed the entire Google Production. (Tr. 59:20–60:5)

After the filtering process (or the first stage of it),[4] SA Yankow and his co-case agent, SA Davis, regained access to the filtered data. (Tr. 54:7–12) Yankow then sent the U.S. Attorney's office a disc containing post-filtering copies of the Google Production data. (Tr. 54:13–21)

Shortly after the events just described, in the spring of 2015, Yankow began his transition to the Aviation Unit of the FBI. His last regular involvement in the case was in approximately August 2015. He is now a surveillance pilot. (Tr. 56:8–13, 57:6–9)

Defendant's post-hearing brief states that Yankow admitted that he learned as early as September 2015 that the emails were missing, but did nothing, in the hope that the loss would go unnoticed. (ECF no. 64-2 at 4) The issue of the date, however, is not critical; even in defendant's version, Yankow would be guilty at most of covering up the disappearance of the evidence, not of destroying exculpatory evidence in bad faith. But at any rate I think that defendant stretches the record too far, and I reject the proffered inference.[5] For

---

3      Cross-examination using contemporaneous internal FBI emails suggested that approximately April 23, 2015, was a likely date. (Tr. 68:4–11)

4      On cross-examination, Yankow was shown an email suggesting that this review encompassed a "first batch" of emails. He had no independent knowledge or recollection of how the filtering process, which did not involve him, may have been segmented. (Tr. 72:4–21)

5      Shown an email on cross-examination, Yankow stated that he did not know what the statement "maybe we could figure it out" referred to. He stated that he "imagine[d]" it related to "what happened with the original production that was sent from Google." (Tr. 75:15–23) Then came the following question and answer:

the reasons stated herein, the evidence supports the inference that the missing Google Production was discovered later, in connection with a privilege review.

Sometime within the two months preceding the hearing, SA Yankow was asked to attempt to locate the original Google Production. He searched through his emails, his laptop, and elsewhere, but was unable to find it. He turned over the laptop to the U.S. Attorney's Office so that it could be searched for data that should be turned over in discovery. (Tr. 57:10–58:24; *see also* Tr. 60:8–15)

I found SA Yankow's testimony credible. His demeanor was frank and forthright. He candidly admitted his lapse in failing to preserve the Google Production in its original form. Although it would have been natural to be defensive or make excuses, he was not and he did not. Where he had no clear memory of the facts, he acknowledged as much, even where the lack of records or witnesses might have permitted him to portray the events in a more flattering light. Although he has not been subjected to discipline (Tr. 63:5–7), common sense suggests that these admissions could not have been career-enhancing.

No source of bias, beyond a law enforcement officer's generic desire to make a case, was identified. During the course of the investigation, SA Yankow transferred to a different job as a surveillance pilot, meaning that he shed any ongoing incentives with respect to this particular investigation. And finally, cross-examination supplemented some of the details, but did not significantly shake, Yankow's account.

---

> Q So you think as of September, 2015, you noticed – or someone noticed that the original production had gone missing?
>
> A Again, without looking at that, sir, I'm unable to say that. It looks like that's what we are looking for based on this email.

(Tr. 75:24–76:3) Given the (at best) equivocal nature of these statements (and Yankow's general haziness about dates, apparent throughout his testimony), I cannot conclude that he was here admitting that he covered up the disappearance of the Google Production. And all of the rest of the evidence is to the contrary.

**B.    Special Agents Pickels and Herron**

Special Agent Michelle Pickels testified that she took over as lead case agent in late 2015. (Tr. 87:18–22)[6]

In December 2016, SA Pickels delivered a copy of the Google search warrant and a copy of what she believed to be the complete Google Production to the U.S. Attorney's Office. (Tr. 88:13–89:18) She did so in order to permit a second privilege review by Assistant U.S. Attorneys not involved in the case (the "filter AUSAs"). (Tr. 89:4–15) One of the support professionals compared the files on the disc supplied by Pickels to the files listed by Google in connection with the production (see Ex. G2), and noticed that some seemed to be missing. (Tr. 89:16–91:3)

SA Pickels attempted to locate the original Google Production. She reviewed hard copy and electronic files and spoke to the case agents. She retrieved the laptop computer of a predecessor agent, Lauri Allen.[7] Some of the files were extracted from Allen's laptop and turned over in discovery. (Tr. 91:4–25, 92:14–21) Pickels contacted SA Yankow, but determined that his laptop copy of the files seemed to be identical to the copy on Allen's laptop. (Tr. 92:22–93:23)

In early March, 2017, Pickels located a thumb drive that the FBI had supplied to the U.S. Attorney's Office. She could not determine whether this was the original Google Production thumb drive, or something else; the data was corrupted and could not be read. (Tr. 93:23–94:24; see also Tr. 113:1–17)

Pickels also looked into the possibility of reconstructing the original Google Production. On December 23, 2015, she requested a second copy from Google. (Tr. 95:1–4) Google responded in substance that the original Google

---

6    Before taking over as case agent, Pickels had general supervisory authority over, but little direct involvement in, the Lattanzio investigation. (See generally Tr.85:23 –88:12.) When Pickels took over as case agent, Mr. Lattanzio had already been indicted.

7    In the interregnum between Yankow and Pickels, SA Lauri Allen served as case agent.

Production as such was not archived; the best that could be done would be to run the same request again. (Ex. G3; Tr. 94:25–20)

In March 2017, the government obtained an order pursuant to 18 U.S.C. § 2703(d) to obtain subscriber information, sender/recipient names, dates, and other non-content information regarding the emails in the two Lattanzio accounts. On April 3, 2017, Google produced the requested information. (Exs. G4, G5, G7, G8; Tr. 97:1–99:15) Pickels acknowledged as a general matter that this process would not capture any data that had been lost or altered since the original production. (See Tr. 114:7–115:24) No evidence was introduced that there had been any such loss or alteration, however.

Special Agent Brian Herron, an FBI Computer Analysis Response Team Technician and Digital Evidence Extraction Technician, testified chiefly about his analysis of the information supplied by Google on April 3, 2017, in response to the § 2703(d) order. (Exs. G7, G8) SA Herron introduced a chart analyzing the email data. (Ex. G6) He gleaned that the two accounts contained approximately 70,000 emails. Of these, based solely on the names of the parties and the dates, "several thousand" could potentially be relevant.[8] (Ex. G6; Tr. 21:19–25:19, passim)

Herron also provided some technical background. In response to a warrant, Google will produce an exact copy of the user's email account in a format known as Mbox. (Tr. 7:21–9:10) The user can personally obtain an equivalent download using a tool called Google Takeout. (Tr. 9:11–16:7; see Exs. G9, G10)[9] Google does not delete emails from an account; only the user has the authority to do that. (Tr. 16:8–12) Once files are deleted, they remain in a "delete" folder for a certain period, which may be 60 days, but may be customized. (Tr. 34:5–35:21) Once again, the Takeout download will reflect only

---

[8]      Judging from the chart (Ex. G6), the total might be as many as five or six thousand.

[9]      Herron was unable to state whether the internal Google process for compiling data is the same as, or different from, Google Takeout, a product intended for use by consumers. (Tr. 28:7–21)

the state of the account, including the delete folder, as of that date. (Tr. 35:9–21) In the case of the § 2703(d) order data, that date was April 3, 2017.[10]

I found SA Pickels and SA Herron to be credible. Cross-examination filled in some details and tied down some dates; it did not significantly undercut their testimony. Indeed, there was not much in either agent's testimony for the defense to quarrel with.

## C.    Miscellaneous Evidence

Finally, the government introduced exhibits and testimony to establish that, at about the time of the original Google Production, Mr. Lattanzio had been sued in two federal court actions brought by persons named as victims in this case. (Exs. G10, G11, G12, G13, G14) The New Jersey Bureau of Securities had also subpoenaed one of Lattanzio's entities, Black Diamond Investments LP, seeking communications involving investors. (Tr. 104:2–105:8) The government infers that Mr. Lattanzio must therefore have been under overlapping obligations to preserve and not to delete emails in his accounts. I consider this evidence but give it little weight. The inference of preservation is weak. If I applied the same reasoning to the government, for example, I would have to conclude that the Google Production remains intact, but the government admits that it does not.

## III.    Legal Discussion

The principles governing the defendant's motion are well settled. The motion is ultimately founded on the due process obligation of the prosecution to turn over exculpatory evidence. *See Brady v. Maryland*, 373 U.S. 83 (1963). The *Brady* turnover rule, however, has required some elaboration in the context of missing or destroyed evidence: "[T]he due process clause requires a different result when we deal with the failure of the State to preserve

---

10    I make no finding as to whether Mr. Lattanzio actually has a copy of any missing emails in his possession. He introduced no evidence on the point, and I granted his motion to quash a subpoena served by the United States that was aimed at probing that issue.

evidentiary material of which no more can be said than that it *could* have been subjected to tests, the results of which *might* have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) (emphasis added). In *California v. Trombetta*, 477 U.S. 479 (1984), the Court held that destroyed evidence will be deemed constitutionally material if it (1) has exculpatory value that was apparent before the evidence was destroyed; and (2) is of such a nature that the defendant is unable to obtain comparable evidence by other reasonably available means. *Id.* at 489.

I consider the *Trombetta/Youngblood* requirements, (A) "bad faith" and (B) "prejudice."

### A. Bad Faith

The first *Trombetta* prong requires a showing that potentially exculpatory evidence was destroyed in bad faith. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). In general, "bad faith" requires that the police have known that the evidence had exculpatory value at the time it was lost or destroyed. *See id.*; *United States v. Jackman*, 72 F. App'x 862, 866 (3d Cir. 2003) (citing *United States v. Femia*, 9 F.3d 990, 994 (1990)).

The touchstone is the government's actual knowledge that the lost or destroyed material contained exculpatory evidence. *See, e.g., Griffin v. Spratt*, 969 F.2d 16, 20 (3d Cir. 1992) (finding of bad faith would stem from police knowledge of exculpatory nature of the evidence at the time it was destroyed); *United States v. Stevens*, 935 F.2d 1380, 1388 (3d Cir. 1991) (no bad faith finding where government did not know whether lost DNA evidence would inculpate or exculpate defendant). Merely "[n]egligent conduct by police officers in handling evidence does not demonstrate bad faith." *United States v. Christian*, 302 F. App'x 85, 87 (3d. Cir. 2008) (not precedential) (citing *Youngblood*, 488 U.S. at 58; *United States v. Deaner*, 1 F.3d 192, 201 (3d Cir. 1993)). Nor does a departure from police or agency procedures for handling evidence, in itself, establish bad faith, although it may constitute relevant

evidence of bad faith. *United States v. Ramos,* 27 F.3d 65, 72 (3d Cir. 1994); *Deaner,* 1 F.3d at 200–01; *see also Christian,* 302 F. App'x at 87.

The testimony and evidence here is all to the effect that SA Yankow failed to comply with FBI procedures for backing up and preserving original electronic evidence. There is no evidence, however, that he knew any emails contained exculpatory information, or that he acted in bad faith. His own testimony is that he simply erred, and there is no contrary testimony or evidence.

Of course, bad faith may be proven circumstantially. Nothing about the circumstances here, however, suggests bad faith. Yankow's explanation—that the failure to back up the data was a regrettable lapse, but nothing more—made sense. The real slip-up occurred immediately upon receipt of the Google Production, when Yankow failed to log or back up the data. It seems that very little review had occurred before the whole matter was turned over to the filtering agent. Indeed, Yankow could not recall reading any of the emails. There was no showing that Yankow, or anyone, found any exculpatory emails in this vast cache, or had any reason to believe there were any. At any rate, if such exculpatory emails had existed, the FBI could not rationally have hoped to get away with suppressing them; there was no guarantee that Mr. Lattanzio did not possess, or could not obtain, copies of the emails from his own accounts.

To establish a due process violation it is not sufficient to point to a trove of documents and merely speculate that it may have contained exculpatory information. *See United States v. Ramos,* 27 F.3d 65, 71 (3d Cir. 1994). There is no evidence suggesting any official animus against Mr. Lattanzio, a government plan to gain tactical advantage, or knowledge that anything in the Google Production was exculpatory. *See Trombetta,* 467 U.S. at 488 (observing that the record did not contain any allegations of official animus toward the defendant or a conscious effort by the police to suppress the exculpatory evidence); *United States v. Heiser,* 473 F. App'x 161 (3d Cir. 2012) (holding that failure of seized

drive and loss of back-up copy did not support finding of due process violation, absent showing of "an intentional act to gain a tactical advantage," any "official animus" toward the defendant, or "a conscious effort to suppress exculpatory evidence.") Mr. Lattanzio himself—and remember, these are his own email accounts—does not point, even generally, to anything in these emails that may have exculpated him.

I do not consider this a close call, or one that could tip depending on which party had the burden of proof. Rather, I find that the evidence falls far short of what would be sufficient to establish bad faith. That absence of evidence is dispositive of the bad faith issue, and the bad faith issue is "dispositive" of the due process claim here. *See Jackman,* 72 F. App'x at 866 (quoting *Femia,* 9 F.3d at 994).

### B.    Prejudice

In addition, and in the alternative, I consider the second *Trombetta/Youngblood* requirement that the defendant demonstrate prejudice. Prejudice requires a finding that the lost evidence "is to some extent irreplaceable," or that the defendant "would be unable to obtain comparable evidence by other reasonably available means." *Trombetta,* 467 U.S. at 489; *see also Jackman,* 72 F. App'x at 866.

The quintessential "lost evidence" issue arises in the *Youngblood* scenario: an identity case, in which the failure to refrigerate body fluid samples from the crime victim rendered them useless for forensic analysis. Such evidence is unique, is in the sole custody of the government, and once lost is lost forever. Lattanzio's situation is simply not in the same class.

What has gone missing is the precise assemblage of emails that comprised the Google Production, as of March 19, 2015. The state of Mr. Lattanzio's Google account on that date, however, has no evidentiary significance. That date reflects nothing but the timing of the government's

11

request, via warrant, for a copy of Google's data. It is not unique evidence, such as DNA from a crime scene.

The Google Production itself is nothing more than a download of electronic copies; it is not unique or primary evidence. This is not third-party or forensic evidence that the government has seized, placed beyond the defendant's reach, and destroyed, depriving him of an opportunity to exculpate himself. These are defendants' own emails, from his own accounts. He could at any time have obtained, and he *still* could obtain, a full set from Google. If any emails present in 2015 are missing now, it is because the defendant himself deleted them; the evidence showed that Google does not delete emails on its own. The number of emails currently on the server—70,000 plus—suggests that there has been no wholesale deletion. The evidence therefore does not suggest that the same evidence, or "comparable" evidence, *Trombetta,* 467 U.S. at 489, is unavailable.

Relatedly, this defendant is not in the impossible position of proving that a piece of evidence seized by the government, and never seen by him, would be exculpatory. As I have said, these are his own emails. If he has deleted any, he has his own memory to go by, if he wishes to make a factual averment that the deleted items contained exculpatory material.[11]

In short, there is no demonstration of prejudice, either in the sense that unique and irreplaceable exculpatory evidence has been lost, or in the sense that equivalent or comparable evidence cannot be obtained.

## C.    United States v. Vaughn

The defendant relies primarily on *United States v. Vaughn,* No. CR 14-23 (JLL), 2015 WL 6948577, at *1 (D.N.J. Nov. 10, 2015). In *Vaughn,* the government failed to preserve certain text messages between law enforcement officers and a cooperating witness. The court granted the defendant's

---

[11]    I add that an email, by its nature, has a sender and a recipient. If Mr. Lattanzio wished, he might seek copies of any important email from the counterparty.

12

application, not to dismiss the entire indictment, but to suppress certain evidence on due process grounds. *Vaughn* is distinguishable on several bases.

First, in *Vaughn*, the government had thoroughly reviewed the text messages before they were lost; there was at least evidence that the government knew what was in the deleted messages. Here, by contrast, there is no showing that Yankow or other agents actually read—let alone found exculpatory material in—the particular emails now said to be misplaced.

Second, in *Vaughn* (as in the classic *Youngblood* scenario), the government's access to the evidence was exclusive. It concerned dealings between government agents and cooperators, a classic source of impeachment material. The defendant had no access to these text messages and was not a party to the texted conversations. It appears that the text messages themselves—as opposed to some particular assemblage of them on a particular date—were permanently and irretrievably lost. The circumstances strongly suggested the conscious exercise of selection between the preserved and unpreserved messages. Here, by contrast, the lost material consisted solely of part of a production (*i.e.* the FBI's *copy* of the Google email accounts), as of a particular arbitrary date. The emails, moreover, were Mr. Lattanzio's own, not communications among third parties, and there was no showing that a current download would not afford an adequate substitute.

*Vaughn* therefore does not control the present case.

### ORDER

Accordingly, IT IS this 1st day of August, 2017,

ORDERED, for the reasons expressed in the foregoing opinion, that the defendant's motion (ECF no. 37) to dismiss the Indictment based on destruction of evidence is DENIED; and it is further

ORDERED, for the reasons expressed on the record, that the defendant's motion (ECF no. 60) to quash subpoenas is GRANTED.

KEVIN MCNULTY, U.S.D.J.