# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Crim. No. 15-446 (KM) |
| v. | |
| **Nicholas LATTANZIO,** | **OPINION** |
| **Defendant** | |

**MCNULTY, J.**

This matter comes before the Court on the post-trial motions of the defendant, Nicholas Lattanzio, for a judgment of acquittal, pursuant to Fed. R. Crim. P. 29(c), or in the alternative for a new trial, pursuant to Fed. R. Crim. P. 33. (ECF nos. 135, 143, 146) I have considered the proffered grounds separately and in combination. For the reasons expressed herein, the motions will be denied.

A jury found Mr. Lattanzio guilty of two counts of wire fraud, and the evidence revealed fraud in its rawest form. Mr. Lattanzio ran an investment fund called Black Diamond Capital Appreciation Fund.[1] Black Diamond was entrusted with two deposits, each for $2 million. The deposits were held as security in anticipation of a larger credit financing transaction. Lattanzio represented to the depositors, BCM Energy, Inc. ("BCM" or "BCME") and HEI Investments, LLC ("HEI"), that the money would be placed in conservative investments. Instead, he quickly drained the accounts and used the money for personal expenses, while covering up that fact through various misrepresentations and omissions. Mr. Lattanzio testified that he believed two

---

[1] Lattanzio had a number of interrelated entities, all called Black Diamond. I ignore the distinctions among them; unless otherwise specified, "Black Diamond" refers to the investment fund. There was evidence that there exists another investment entity, also called Black Diamond, located in Connecticut, which appears to be wholly unrelated to Mr. Lattanzio or the facts of this case.

large credit financing transactions would close, permitting him to cover the withdrawals with his future fees and commissions. That excuse need not have been credited by the jury; nor would it constitute a defense to the wire fraud charges.

The jury also found Mr. Lattanzio guilty of two counts of securities fraud, based primarily on false statements and manipulations in connection with solicitation of the investments. Here, the defense had a bit more to work with, as other persons were involved in structuring the transactions. But even setting that aside and focusing on the actual statements and conduct attributed to Lattanzio himself, there was sufficient evidence to support the verdict. In communications to representatives of BCM and HEI, Lattanzio misrepresented the Black Diamond fund's 2008–12 history of operations and profitability (which in fact were negligible). He also misrepresented the particular investments into which the depositors' money would be placed.

Analyzing this as an ordinary case of material misstatements, however, would miss the larger point. The overall artifice and false statement was that BCM's and HEI's money would be placed in *some* sort of investment, as opposed to being stolen. Lattanzio's immediate diversion of funds, on the same day they were wired to the fund (and after), would easily support an inference that he received the funds with contemporaneous fraudulent intent.

One theme of the defense was that the true fraudster was an associate of Mr. Lattanzio's, Pasquale ("Pat") Montesanti. As to the wire fraud charges, this evidence, even if credited, would have had little effect. Montesanti had no authority over the accounts, which were controlled solely by Lattanzio. The evidence demonstrated that Lattanzio himself looted the accounts for his personal benefit, spending the money on such items as jewelry, private school tuition, and a new home. As for the securities charges, there was evidence that Montesanti acted as Lattanzio's go-between or "finder," and was involved in many of the communications to the potential investors, BCM and HEI. A jury could have drawn the commonsense inference that Montesanti acted in concert with Lattanzio, or with his knowledge; the $4 million in investments, after all,

2

directly benefited Lattanzio, not Montesanti; the two sometimes met with the investors together; and Lattanzio at least once explicitly ratified Montesanti's emailed statements that the funds had been appropriately invested. More to the point, however, there was ample evidence that Lattanzio himself misrepresented the facts in direct communications with the investors.

A second defense theme involved a shadowy group of would-be financiers, including individuals such as William Cloutier, Tom Thresher, and Jim Helfer, as well as entities known as Corban, Wall Street to Main Street, and Esquiroz Abogados. These persons and entities, said the defense, were supposed to supply a total of $28.5 million in credit financing for BCM and HEI. The role of Lattanzio and Black Diamond in the transaction, however, was not to obtain the credit financing. They were to conservatively invest the advance deposits of BCM and HEI. Each of the two $2 million advance deposits was agreed to be fully refundable if the financing was not obtained within a short period. Although the financing never materialized, Lattanzio never returned the deposit money to BCM and HEI.

The defense strove to establish that the financing did not materialize because the various potential financiers were fraudulent, or at least shady. As a defense, that was implausible; the jury was asked to believe that these financiers, largely unconnected to Lattanzio, tricked him into receiving $4 million, receiving only much smaller sums, or nothing at all, themselves. The jury was not required to accept that inference; more to the point, under the Rule 29 standard, the Court may not presume that the jury did accept it. In the larger sense, however, it did not matter. This scenario, far from being exculpatory, was a massive diversion from the merits. Nothing about any fraud in the abortive financing end of the transaction would have entitled Lattanzio to misrepresent the nature of the fund and its investments or, *a fortiori,* to simply help himself to the deposit money.

## I.    Procedural Background

On September 3, 2015, Mr. Lattanzio was charged in a four-count Indictment. (ECF no. 9)

Counts One and Two charged Lattanzio with wire fraud, in violation of 18 U.S.C. § 1343. As the principal of an investment fund and other entities named Black Diamond, Lattanzio was alleged to have conducted a scheme and artifice to defraud two victims (BCM and HEI, anonymized as Company A and Company B). The object of the scheme was to misappropriate the victim companies' funds for Lattanzio's personal benefit. The funds consisted of advance deposits, required as a prerequisite to the arrangement of a much larger credit facility. Instead of investing the funds as promised, Lattanzio allegedly spent them on personal items and expenses. To induce the investments, he allegedly made misrepresentations about the history and profitability of the Black Diamond investment fund.

Count Three charged Lattanzio with securities fraud in relation to BCM, in violation of 15 U.S.C. §§ 78j(b) & 78ff, and 17 C.F.R. § 240.10b-5. Count Four charged him with securities fraud in relation to HEI.

The case was tried for approximately three weeks. Jury selection began on January 24, 2018. The defense put on a case, and Lattanzio himself testified. On February 15, 2018, the jury returned verdicts of guilty on all four counts.

## II.   Summary of Evidence

As an aid to understanding, here is the essential structure of the transactions at issue:

Two victim companies, BCM and HEI, sought credit financing for their operations. BCM sought approximately $20 million, and HEI approximately $8.5 million, in financing. Mr. Lattanzio was not involved, however, in the financing side of the transaction; he was on the investment/disbursing side. His fund, Black Diamond, was to hold and invest the funds, periodically disbursing them in response to draw requests by the borrowers. HEI and BCM were each required to make an up-front deposit or "compensating balance" of

4

$2 million in the Black Diamond fund. Both HEI and BCM were entitled to a full refund of their deposits if the financing did not come through within 70 or 120 days. If and when the $20 million or $8.5 million in financing was obtained, those funds, too, were to be held and invested by Black Diamond. The borrowers would submit draw requests from time to time as funds were needed, and Black Diamond would disburse the funds. The initial $2 million deposits would be held as security, not to be disbursed until the final draw. In the meantime, all funds on deposit would be placed in specified low-risk, liquid, fixed-income investments. For his services, Mr. Lattanzio would earn a percentage fee.

### A.      Representations in connection with investments of $2 million by BCM and HEI

BCM invested through the vehicle of a limited partnership interest. BCM's private placement memorandum (PPM) provided that the fund would invest in "highly-liquid fixed income instruments using one of two proprietary investment strategies." (G201 at 6)[2] The first strategy involved fixed income investment grade instruments, with no risk to principal; the second involved AAA government securities such as Treasury or agency bonds trading in the secondary markets. (*Id.* at 7) HEI was a direct investor. HEI's investment

---

[2]      G__ refers to government exhibits; D__, to defense exhibits.

I adopt the government's state-court-style method of designating the transcripts of the substantive testimony at trial:

  1T – January 26, 2018 (ECF no. 114)

  2T – January 29, 2018 (ECF no. 115)

  3T – January 30, 2018 (ECF no. 116)

  4T – January 31, 2018 (ECF no. 117)

  5T – February 1, 2018 (ECF no. 118)

  6T – February 5, 2018 (ECF no. 137)

  7T – February 6, 2018 (ECF no. 139)

  8T – February 8, 2018 (ECF no. 138)

Other transcripts, which do not include testimony, are identified by date.

management agreement ("IMA", G302) specified a similar investment strategy involving low-risk, liquid fixed-income investments. (1T 44–55)

Both BCM and HEI explicitly agreed with Lattanzio that these $2 million investments would act as a kind of security deposit, *i.e.,* earnest money in contemplation of the larger financing deal. BCM's letter of understanding (LOU) provided that BCM would be permitted to "withdraw its [capital deposit] after one hundred and twenty days (120) if BCME has not received a binding commitment from the designated lender." (G 204) HEI, too, was entitled to withdraw its $2 million deposit if it did not receive a binding financing agreement within 70 days. (G 302 at 5) This was a key, negotiated term for both investors. (*See* 2T 69:24, 1T 55:17–22)

At a meeting on December 11, 2013, Lattanzio presented BCM's representative, Mr. Beach, with historical investment returns from 2008 through early 2013. He did not reveal that the fund had only recently begun operating at all, had no significant prior investments, and had produced no returns. Lattanzio orally confirmed to Beach what the PPM said: that BCM's deposit would be placed in conservative, liquid, fixed-income investments. (1T 31:3–33:8)

HEI received similar assurances. In a conference call in June 2014, Lattanzio told HEI's representative, Mr. Meroney, that HEI's $2 million deposit was one of the last that would go into an investment pool of $25 to $50 million; that the fund had $100 million under management; and that the fund had been formed seven or eight years previously. (1T 10:16–12:8) A Black Diamond "due diligence questionnaire" confirmed that the fund had $100 million under management and could manage up to $1 billion with its current staff and resources. (G 306)

Both BCM and HEI received Black Diamond promotional materials before investing the companies' funds. These included a "tear sheet" (G 224, supplied to BCM) and a "due diligence questionnaire" (G306, supplied to HEI). These stated that Mr. Lattanzio's proprietary fixed-income investment strategy, though highly conservative, had produced eye-popping annual returns

averaging 18% from 2008 through 2012 or early 2013. In fact, Black Diamond had no such historical performance results. The documents themselves will bear the interpretation that these figures were presented to the investors as real-world, historical data. Beach and Meroney both testified that, when they invested, they relied on these figures as representing actual, not theoretical, rates of return. (1T 27:20, 2T 45:14)

### B.  Lattanzio's use of the $4 million for personal expenses

BCM and HEI, in reliance on such representations, each deposited approximately $2 million up front, only to have it rapidly disappear.

After the December 11, 2013 meeting, and after signing the necessary papers, BCM transferred just under $2 million to Black Diamond. On December 23, 2013, Lattanzio confirmed with Beach by email that the money had just "hit Barclays [Bank]." (G 213) The very same day, Lattanzio transferred $102,000 of the money to a personal account and used it to buy a diamond ring for his fiancée. (G411, 507) A few days later, he withdrew another $124,000 and used it to purchase a Range Rover. (G411, 506) Shortly thereafter, he transferred $182,000 to another Black Diamond account. Of that money, $45,000 went to pay his personal American Express bill, and some of the rest was applied to Black Diamond's payroll (including Lattanzio's own salary). Over the ensuing months, Lattanzio regularly transferred BCM's money out of the account. The funds went to pay his personal credit card bills, his children's private school tuition, and golf club dues, as well as to fund cash withdrawals. (G 411, G 430)[3] By August 2014, nearly all of the $2 million had been depleted. (G411, G 102(i))

On August 21, 2014, HEI wired its $2 million deposit to Black Diamond. The very same day, Lattanzio wired $1 million of HEI's funds to a title company for the purchase of a personal residence in Montclair, New Jersey. (G 102(i), 508A–C) Over the following months, he used additional hundreds of thousands

---

[3]  Lattanzio used some of the BDM money to purchase securities. He then sold the securities, however, and spent most of the proceeds. (G 436; 4T 194:8–195:14)

of dollars to fund renovations to the home. (G 411 at 9–14; 2T 5–19) As in the case of BCM, HEI's money was withdrawn for credit card bills, private school tuition, and general personal expenses. (*Id.*)

By late November 2014, the Black Diamond fund had a balance of approximately $300,000. This was lower than the balance that had been in the fund before BCM and HEI made their deposits. (G 411, 412)

### C.    The Cover-up

Mr. Lattanzio covered up his theft and avoided refunding the money by means of various false statements and stratagems.

On behalf of BCM, Mr. Beach early on began requesting periodic statements, as would customarily be furnished for such an investment account. (2T 75:17–76:5) Lattanzio never sent them. (*Id.*; G 242) When the credit funding failed to materialize, Beach requested a refund of BCM's money, to which BCM was entitled. (2T 82:23) The response was double-talk and delay. Lattanzio first said he could only return the funds to their source, BCM's Hong Kong investor. (G 216) Then he said BCM had "accept[ed] the term sheet and confirmation of the credit facility" and was not entitled to the refund. (G 218) Then he said that BCM should wait, because its money was tied up in investments, the liquidation of which would cause a large loss. (G 221) Then, in response to a lawyer's August 2014 demand letter, Lattanzio emailed back that he had "invested the funds, per the PPM" (which would imply a liquid, fixed-income investment). (G 241) The same Lattanzio email also stated that a recent email from Montesanti, which had stated *inter alia* that the money was in government-backed mortgages, was the "truth." (*Id.; see also* G222) What Lattanzio never revealed was that he had already spent the money. (2T 120:9)

For BCM's investment, regular statements of net asset value (NAV) would have been prepared by the fund administrator, Custom House. Custom House repeatedly asked Lattanzio for brokerage statements as backup, so it could prepare the NAV statements. (3T 166:20) Lattanzio ignored those requests. Then, in September 2014, Lattanzio told Custom House there was essentially nothing to report, because the only investment of BCM's $2 million had

consisted of a loan. At first Lattanzio stated it was an internal loan from the Black Diamond investment fund to another Black Diamond entity, and proffered a loan document as support. When Custom House questioned the propriety of such an insider loan, Lattanzio replied in an email, "I can fund mortgages. Should I paper this up that way?" (G 604, G 606; 8T 143:1–2) Shortly thereafter, Lattanzio presented Custom House not with a mortgage, but a $2 million promissory note to Black Diamond from Lattanzio's fiancée. (G 604) Lattanzio admitted that this "papering" occurred some nine months after BCM had invested the money, at a time when Lattanzio had already spent most of it. (8T 144:11–145:2) When Custom House eventually saw the brokerage account statements that revealed the true history of Lattanzio's withdrawals of BCM's money, it terminated its contract with Black Diamond. (3T 215:4)

With HEI, Lattanzio was no more candid. In mid-December 2014, he responded to HEI's request for an account statement with a one-page letter. The letter stated that HEI's account had a balance of over $2 million, having earned $58,000 in interest and capital gains. (G 304) At the time, the actual total amount in the Black Diamond fund was about $300,000. (G 412) HEI's money had not been placed in any authorized investment that would have yielded $58,000 in interest or capital gains. The letter said nothing about Lattanzio's having drained the account for, among other things, the purchase and refurbishment of his Montclair residence.

In December 2014, the financing having failed to appear, Meroney sent a demand for return of the funds. (G 305) Lattanzio told him the money was invested in a "pool" of funds and would be returned when an equivalent amount of new money came in. (1T 74:21) Later, in January 2015, Lattanzio said the funds were "illiquid" because they were invested in two residential mortgages. (*E.g.,* 1T 75:9–20) Asked directly whether the mortgaged properties were either his or his girlfriend's personal home, Lattanzio replied, "Absolutely not." (1T 78:9–23)

### D.    Lattanzio's testimony

Mr. Lattanzio did not deny that he and his fund had been entrusted with the $4 million. Nor did he really deny that he had spent it on himself and his fiancée, as charged. He expressed a need to repay his fiancée, who had been financially and emotionally supporting him since his life had descended into turmoil following the death of his wife. (8T 73)

Lattanzio testified that he, no less than BCM, expected the $20 million in financing to come through from the various putative financiers. And when it did, he said, he believed he would earn enough money in fees to cover the funds he had taken and spent for the benefit of his fiancée. Spending BCM's money, he conceded, was "unprofessional." (*Id.*)

As for HEI's money, Lattanzio testified that the money spent on his personal residence was invested in a "fixed income instrument," *i.e.,* a mortgage, as authorized by the investment agreement. Lattanzio testified that such a mortgage had been "drafted." (8T 91:9–19) At any rate, however, he admitted that a residential mortgage is distinct from a liquid, fixed-income instrument, or a AAA rated government debt obligation (8T 111:7–112:9), the only investments that would have been permitted by the deal documents.

On cross-examination, Lattanzio admitted many of the essential elements of the government's case regarding BCM:

(a) He never told Beach, either personally or *via* the PPM or LOU, that BCM's money would be used for personal expenses. (8T 114:2–18, 115:7)

(b) He continued to spend BCM's money even after it was clear that the financing had not come through. (8T132: 5)

(c) Because he "panicked," he lied to Custom House about his having spent BCM's money. (8T 85:12, 140:20–145:2)

(d) When BCM asked for its money back, Lattanzio cited "liquidity" concerns but did not reveal that the money had been spent. He hoped that additional "projects in the pipeline" would produce enough fees to cover the withdrawals. (8T 84:6–20, 145:6–148:12)

On cross-examination, Lattanzio also admitted many of the essential elements of the government's case regarding HEI:

(a) The IMA signed by HEI did not state that Lattanzio could use HEI's money for personal expenses. (8T:110-10 to 111-6);

(b) A personal residence was not listed as an authorized investment. (8T:111-25)

(c) Lattanzio sent HEI a letter stating that its capital account stood at over $2 million and had earned $58,000 in capital gains and interest. (8T 148:19–149:20)

Lattanzio also admitted that, even today, BCM and HEI "are absolutely due their money back." (8T 95:19)

### III.  Motion for judgment of acquittal

Mr. Lattanzio moves for an order setting aside the jury's verdict of guilty on all four counts and directing entry of a judgment of acquittal. He asserts that there was insufficient evidence that he made material misrepresentations or omissions with the requisite intent to defraud. I will deny the motion because it comes nowhere near the high threshold for entry of a judgment of acquittal notwithstanding the verdict.

Federal Rule of Criminal Procedure 29(c) authorizes a post-guilty-verdict motion for a judgment of acquittal. Under Rule 29, a defendant who asserts that there was insufficient evidence to sustain a conviction shoulders "a very heavy burden." *United States v. Anderson,* 108 F.3d 478, 481 (3d Cir. 1997) (quoting *United States v. Coyle,* 63 F.3d 1239, 1243 (3d Cir. 1995)). The court cannot substitute its judgment for that of the jury. Hence it must view the evidence, and all reasonable inferences therefrom, in the light most favorable to the prosecution, resolving all credibility issues in the prosecution's favor. *United States v. Hart,* 273 F.3d 363, 371 (3d Cir. 2001); *United States v. Scanzello,* 832 F.2d 18, 21 (3d Cir. 1987). Having done so, the court must uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v.*

*Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original). *Accord United States v. Caraballo-Rodriguez,* 726 F.3d 418, 430-31 (3d Cir. 2013) (en banc) (reaffirming principle and reversing a line of drug conspiracy cases that seemingly undermined it); *United States v. Silveus,* 542 F.3d 993, 1002 (3d Cir. 2008) (issue for trial or appellate court is "whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence"); *United States v. Smith,* 294 F.3d 473, 476 (3d Cir. 2002).

Lattanzio correctly states that wire fraud and securities fraud, the offenses of conviction, both have the element of intent to defraud. The jury was so instructed, without objection. (ECF no. 142, 2/13/18 Tr. 181, 185, 189, 194–96; *see also id.* 204–06 ("good faith" is inconsistent with criminal intent).) I therefore review Mr. Lattanzio's contentions that the evidence did not prove, or even disproved, that he acted with intent to defraud.

**A. Securities fraud**

There is not a strict division between the evidence pertaining to securities fraud and that pertaining to wire fraud. For purposes of securities fraud, however, it is convenient to focus on misrepresentations made in and around the time that BCM and HEI made their investments.

### 1.    History and profitability of Black Diamond Fund

Lattanzio denies that the Black Diamond promotional materials Beach and Meroney saw before investing were actually intended to represent historical returns.

Government Exhibit 224 was presented to Beach and BCM. It contains a "tear sheet," which presents "historical *pro forma* returns" to illustrate the Black Diamond Capital Appreciation Fund's performance from 2008 through March 2013:

Historical Pro Forma Returns Per One Million Dollars Of Capital Under Management Through December 2012

| | Annual % Return | Sharpe Ratio | Volatility | Earnings From Price Changes | Earnings From Interest Accruals | Total Cumulative Portfolio Earnings |
|---|---|---|---|---|---|---|
| **Since Inception** (January 2008 – March 2013) | 18.14 % | 1.2422 | 3.5185 | $ -129,866 | $ 1,082,261 | $ 952,394 |
| 2012 | 9.76 % | 1.1024 | 1.7709 | $ -80,223 | $ 177,852 | $ 936,293 |
| 2011 | 10.31 % | 1.4766 | 1.4291 | $ -109,775 | $ 212,871 | $ 838,663 |
| 2010 | 32.32 % | 3.3074 | 2.5589 | $ 105,596 | $ 217,587 | $ 735,568 |
| 2009 | 24.26 % | 0.9446 | 6.4967 | $ 8,430 | $ 234,149 | $ 412,384 |
| 2008 | 16.98 % | 1.1431 | 3.5307 | $ -26,595 | $ 198,400 | $ 169,806 |

Beach testified that he understood the term "*pro forma*" to apply to the statements' being in the proper form. From his considerable experience in business and finance, Beach testified that every major investment fund presents data in a similar format to show actual, historical returns. In the context of past (as opposed to predicted) performance, *pro forma* would have signified the application of actual return rates to an arbitrary $1 million starting balance "to show pro forma what that $1 million would have generated." (2T 53:18–54:17) It would have made no sense to present past rates of return, which were already known, on a hypothetical basis. (2T 55:21–56:3) Lattanzio never indicated that these were hypothetical figures. Beach testified that in a face-to-face meeting with Lattanzio in December 2013, he was led to believe that the fund had been in existence since 2008, and that it had a history of profitability. (2T 31:3–32:14, 54:25–56:3) In fact the fund had almost no history, and very little money invested. Lattanzio admitted in testimony that the fund had only one prior investor, who had conducted a small currency trade. (8T 103:3–8)[4]

---

[4]     Mr. Lattanzio testified, by the way, that he formed the "conception" of the hedge fund in 2009, but that it was not "up and running" until 2013, and that it produced no significant income in the interim. (8T 50:22–51:22) Lattanzio points to discrepancies in the materials which should have led an investor to question whether the fund truly began operating in 2008, as the "historical" returns implied. The due diligence questionnaire presented to HEI, for example, gave a date of 2009. A disclaimer in the BCM subscription agreement stated that Black Diamond Capital Appreciation Fund, LP "has either no or only limited financing operating history." (G 207, p. 25, at M.1) Beach testified, however, that this was a boilerplate disclaimer, commonly found in such documents. (2T 197:3). Along the same lines, Lattanzio cites an "initial" partnership closing date of October 1, 2013 in the private placement memorandum (PPM). (G 224) These discrepancies, buried in disclosure documents, must be considered in the context of actual, prominent misrepresentations by

13

Government Exhibit 306, the due diligence questionnaire, was presented to Meroney and HEI. It contains a chart entitled "Pro Forma Results For Fixed Income Investment Management Results As Per Every One Million Dollars of Capital Under Management Summary From January 1, 2008 Through June 28, 2013." It contains different figures from those provided to BCM (the discrepancy is unexplained):

| **Total Portfolio Earnings** | | **Annualized Portfolio % Return On Capital** | |
| --- | --- | --- | --- |
| Since Inception (January 2008): | $1,000,492 | Since Inception (January 2008): | 18.19% |
| 2012: | $130,962 | 2012: | 13.10% |
| 2011: | $77,284 | 2011: | 7.73% |
| 2010: | $336,435 | 2010: | 33.64% |
| 2009: | $232,123 | 2009: | 23.21% |
| 2008: | $225,731 | 2008: | 22.57% |

Mr. Meroney, who has an extensive background in finance, testified that he understood the chart to summarize the returns of actual trading that had been done by Black Diamond from 2008 through June 2013. (1T 23:6–23) This, he said, jibed with what Mr. Lattanzio told him in telephone calls about risk, return, and monies deposited. (1T 23:24–24:6; 1T 25:25–26:12) The term *pro forma*, he said, might properly be used in connection with forecasts or estimates. There would be no reason for past results, however, to be presented on a hypothetical basis "when you have the actual numbers." (1T 27:18–28:2) Meroney was not told that the only other major investor in the fund was BCM, which had invested in December 2013, and that BCM's money had not been invested but spent. (1T 31:23–32:13)

Lattanzio urges that "*pro forma*" does not imply actual, historical returns. The figures supplied to both BCM and HEI, however, were titled "historical"; they were not identified as alternative scenarios or projections; and they referred to past years, not future ones. They are perhaps *pro forma* in the

Lattanzio as to the fund's age and history of profitability, outlined above. Assuming that the evidence conflicted, it was up to the jury to weigh it.

limited sense of purporting to present returns per $1 million invested, as opposed to being a statement of a particular investor's account. There was no evidence, however, that anybody besides BCM and HEI had ever invested a significant amount of money, let alone received such returns.

A major weakness in Lattanzio's argument, here and at trial, is that he provided no coherent explanation of what these 2008–2012 figures *did* represent, if not actual historical returns. But set that aside. The point is that the jury was entitled, if it wished, to take these "historical" figures at face value—and to accept the testimony of Beach and Meroney, experienced businessmen and investors, that they reasonably understood these figures to have some basis in actual, real-world events.

I do not imply, by the way, that BCM and HEI sought to maximize return; far from it. This was deposit money, and BCM and HEI were interested primarily in safety and preservation of capital. (1T 37:5–9; 2T 61:8–11) The real significance of Lattanzio's misrepresentations was to lull BCM and HEI into believing their money would be safely invested. In actuality the money was not invested at all, but diverted to Lattanzio's personal use.

### 2. Nature of Investments

As noted above, both BCM and HEI were assured, orally and in writing, that their $2 million deposits would be placed in particular classes of fixed-income instruments, described as highly liquid investments with little or no risk to principal. That did not occur.

A key issue is whether Lattanzio solicited and obtained the $2 million investments of BCM and HEI with fraudulent intent. There was ample evidence to support the jury's conclusion that Lattanzio acted from the beginning with the conscious intent to divert the funds, rather than invest them. The jury reasonably concluded that these were not legitimate, good faith investments that somehow went wrong.

To begin with, Lattanzio began stealing the funds the very day they were received. On December 23, 2013, Lattanzio emailed Beach that BCM's $2 million had hit the Barclay's account. Lattanzio immediately withdrew

$102,000 to purchase a diamond ring; just a few days later, he withdrew $124,000 to purchase a Range Rover; shortly thereafter, he transferred $182,000 to another Black Diamond account; and over the following months he systematically drained the account for his personal benefit. Those personal expenditures account for virtually all of BCM's money. Little if any of the money was invested as promised.

The jury could easily infer that this was Lattanzio's plan all along. None of his actions evince any intent to invest and safeguard BCM's money. By August 2014, BCM's money was gone. Certainly at that point, Lattanzio could not have thought that BCM's $20 million credit facility was in the offing, or that his fees would cover the diverted funds.

And then he did it again.

In August 2014, Lattanzio received HEI's $2 million deposit, having represented that he would invest it in conservative, fixed-income instruments. He siphoned off $1 million on August 21, 2014, the very day he received it. The remainder of HEI's $2 million he drained from the account over the ensuing months. A jury could permissibly, indeed easily, conclude that Lattanzio accepted HEI's money, too, with the contemporaneous, fraudulent intent that it would not be invested as promised.

### 3.    Assets Under Management

Mr. Lattanzio argues that he did not engage in misrepresentations when he said that the fund had $50 million (or had $100 million, or soon would have $100 million) under management. (*See, e.g.,* G 306 (due diligence questionnaire; 1T 10:16–12:8 (Meroney testimony about June 2014 conference call).) Lattanzio admitted that, aside from BCM and HEI, there was just one other investor, someone who "gave us a small amount of money to do a currency transaction, a currency computerized trading. Very small, though." (8T 103:3–8) Given Lattanzio's outright thefts, his lulling representations as to the amount of assets under management were perhaps of secondary importance. I nevertheless discuss the issue briefly.

Mr. Lattanzio testified that he sincerely "believed" the fund had $100 million under management. (8T 57:3–5) In support, he produced a one-page printout from BNY Mellon, entitled "Custody Holdings by Security." This document had never previously been mentioned, nor had it been produced in discovery. I nevertheless admitted it in evidence. (D 12012; 8T 58:24) The document seems to indicate the Black Diamond has deposited three bonds, issued by 1st National COS, Inc., each in the amount of $650 million, for a total of $1.95 billion. (D 1201; 8T 59:14–62:15) It is dated April 1, 2011, at least two years before any representations to BCM or HEI about assets under management. According to Lattanzio, the bonds were issued by a "private mining company." (8T 101:6–10)

The bonds, said Mr. Lattanzio, were "144a bonds [which] are not tradeable, but some lending institutions will give loans or margin against those." (8T 51:13–14) Such 144a bonds,[5] he said, are "private placement" instruments; their sole function was "to get margin for the investor who gave them to us for the [investment] strategy." (8T 62:8–12) There being no established market, the stated value of the bonds represented Mr. Lattanzio's own "very conservative[]" estimate. (8T 51:9–10) He stated that he "intended" to "get margin against them and then put them into the Ray Comisso [investment] strategy." (8T 51:15–18)

There was no further development of this evidence. For all that appeared in the record, these bonds represented nothing real. There was no testimony that anyone had ever paid for them, or that anyone but Mr. Lattanzio himself had attributed any value to them. There was no testimony that Lattanzio ever did anything to implement his "intent" to use them as collateral for any investment in the fund. (Nor did he explain in what sense the value represented

---

[5]     The reference is apparently to SEC Rule 144a, which increases liquidity by modifying the ordinary two-year holding period requirement for certain privately placed (unregistered) securities. It permits qualified institutional buyers (generally very substantial accredited entities) to trade positions among themselves more freely. *See* Investopedia, https://www.investopedia.com/terms/r/rule144a.asp.

by such bonds, lodged with a custodian, were "under management" by the fund.) Nor did Mr. Lattanzio explain why, if he was in a position to exploit an asset worth $100 million, or $650 million, or $1.95 billion, he found himself in such financial straits. Finally, his inchoate "intent" to "get margin" and then invest the funds did not entitle him to present hypothetical 2008–12 investment returns as real.

Finally, the evidence of the bond holdings dated from 2011. Lattanzio admitted that if, in 2014, he "had told Mr. Meroney that we had . . . $100 million under management, that would have been inaccurate." (8T 104:2–13) He did not explain further; perhaps he meant that the bonds were no longer under Black Diamond's control by then. Lattanzio testified that he believed the due diligence questionnaire had been revised by 2014, so that the representation of $100 million under management would not, to his knowledge, have been made to Meroney at that time. (8T 103:22–24) That excuse, however, ignores Mr. Meroney's testimony that Lattanzio himself made identical oral representations in a conference call in June 2014. (1T 10:16–12:8) The jury was entitled to credit that testimony.

In addition, when pressed, Lattanzio admitted to the authenticity of a nearly contemporaneous, July 2014 email from himself. In that email, Lattanzio stated to another investor that the fund had $50 million under management, with another $50 million coming in September. (8T 106:4–12, 107:17–108:2) For the jury, this would tend to undercut Lattanzio's explanation that he had ceased making such representations about assets under management by 2014, when they would no longer have been accurate.

In short, the jury was not required to find that Mr. Lattanzio had a good faith belief that the fund actually had $100 million under management.

## B.    Wire fraud

At any rate, none of the disputes discussed above substantially undercut the viability of the two wire fraud counts of conviction. The wire fraud scheme and artifice included, but was not confined to, the pre-investment representations about the age, nature, or profitability of the fund, discussed

above. Here, I focus more on Lattanzio's post-investment conduct and statements: failing to invest BCM and HEI's money, looting the BCM and HEI accounts for his personal benefit, and covering up that conduct with lies and misdirection. This fraud evidence requires less comment.

### 1. Overview of evidence of intent to defraud

I briefly sum up the evidence of intent to defraud, reviewed at greater length in Section II, *supra*.

On December 23, 2013, BCM transferred just under $2 million to Black Diamond, to be held in specified conservative, fixed-income instruments. That very day, Lattanzio took $102,000 of the money to buy his fiancée a diamond ring; a few days later, he took $124,000 to purchase a Range Rover; shortly thereafter, he withdrew $182,000, which substantially was applied to personal expenses and Black Diamond's payroll. In the following months, Lattanzio essentially stole the rest of BCM's money. It went to pay personal credit card bills, private school tuition, and golf club dues, as well as to fund cash withdrawals.

On August 21, 2014, HEI wired its $2 million deposit to Black Diamond. The same day, Lattanzio used $1 million of those funds to purchase a residence. He used additional hundreds of thousands of dollars to fund renovations to the home. Again, money was withdrawn for credit card bills, private school tuition, and general personal expenses.

Lattanzio ignored or avoided BCM's requests for statements of account. When the funding failed to materialize, he put off BCM's request for a refund of its $2 million, to which it was concededly entitled. The excuses (for example, that the money was somehow tied up) and the inconsistent assurances (for example, that it was in liquid, fixed income investments, as promised) were lies. Lattanzio lied to Custom House, the fund administrator, and avoided its request for the backup brokerage statements which would have revealed the fraud.

HEI, too, requested account statements, but received only a false letter stating that HEI's account had a balance of over $2 million, having earned

$58,000 in interest and capital gains. At the time, the actual total amount in the Black Diamond fund was about $300,000. (G 412) Like BCM, HEI demanded a refund of its $2 million when the credit financing failed to close. Again, Lattanzio lied. He said the money was tied up, or that it was "illiquid" because it was invested in two mortgages. He denied that the claimed mortgages were on the personal residences of himself or his girlfriend.

This evidence would easily justify a jury finding of intend to defraud.

## 2.   The funding side

As noted above, these transactions had a "funding side" (*i.e.,* the hoped-for credit financing from various persons or entities) and an "investment side" (Lattanzio and Black Diamond's conservative investment and periodic disbursement of the funds).

Mr. Lattanzio made a number of interrelated contentions, all of which were attempts to demonstrate that there was fraud on the funding side. The defense cast doubt on the honesty of the would-be financiers, including individuals such as William Cloutier, Tom Thresher, and Jim Helfer, as well as entities known as Corban, Wall Street to Main Street, and Esquiroz Abogados. Their conduct, the defense at times argued, was motivated by advance fees. Thresher and Esquiroz did apparently receive relatively small advances or fees, not approaching the $4 million Lattanzio received.[6] The defense called Thresher and Helfer (7T, 8T, *passim*) to testify about various unconsummated negotiations, with the apparent intent of demonstrating that they led Lattanzio to expect that BCM's credit funding would go through. Thresher and Helfer, however, had nothing to do with the $2 million deposits or Lattanzio's management of them, and knew nothing about any representations Lattanzio might have made to Beach or, especially, Meroney.[7] (*See, e.g.,* 7T 171:18–

---

[6]   There was evidence of smaller fees being paid on the funding side. (*See, e.g.,* 7T 89:7–90:10, 204:7–9) (Helfer was paid $30,000 underwriting fee); 7T 51:9–11 (Lattanzio wired $134,000 retainer to Esquiroz Abogados.))

[7]   Helfer, for example, was asked by the prosecution whether he knew anything about Lattanzio's representations to BCM or HEI, what he did with the $2 million

173:24; 8T 32:16–33:13) The charged fraud was all on the Lattanzio/investment side. Nothing about any bad faith on the never-consummated funding side would have exculpated Lattanzio for looting the accounts.

Lattanzio testified that he expected the financing to come through. When it did, he said, he would have covered his withdrawals of the funds entrusted to him with the fees he would earn. The jury did not need to accept this. And even if it did, it could well have concluded that Lattanzio knew his diversions of funds were fraudulent—he just thought they would go undiscovered, engulfed by a flood of money (also not belonging to him) that would come in later.[8]

As I say, the jury cannot be presumed to have accepted the truth of Lattanzio's account. But even if he was sincere, Lattanzio had to know he was not entitled to accept investment money and simply spend it. His optimism about future earnings did not entitle him to steal present funds.

The defense proceeded on a more vague theory that the mysterious persons and entities on the funding side were the "real" criminals, as if that would exclude any finding of fraud by Lattanzio. As a theory of exculpation, this was simply incoherent. For this reason, certain of Lattanzio's contentions about the trial or the evidence are simply immaterial.

---

deposits, or whether he even knew who Dennis Meroney was. He did not. (8T 32:16–33:13)

[8]     Lattanzio was actually careful to confine his "intended repayment" theory to the covering of his purchases of a ring and a car:

> Q. What was your belief and understanding -- when you were purchasing material for Maggie to thank her, what was your understanding of whose money that was?
>
> A. I understood it was BCM's money, but Black Diamond was entitled to fees off of the money. And I firmly believed that Tom Thresher was going to come in with his 90 percent of the money, so I was able to, for lack of a better word, justify the expenditures off of the fees that Black Diamond were going to receive.

(8T 73:13–21) The jury was entitled to, and probably did, disbelieve this story. But in any event, for the $20 million in BCM funding, Lattanzio expected a fee of $400,000. (8T 74:7) That would fall $3.6 million short of covering the total of $4 million in deposits that he diverted.

Thus, for example, he argues that the jury should not have believed Beach because of the "Beach memo" (G 243). This was a summary of facts, written by Beach to his attorneys in parallel civil litigation, that focused on other "proposed defendants" on the funding side but said little about Lattanzio. Beach explained, however, that this memo was intended to supply his lawyers with background about players other than Lattanzio—whom Beach did indeed sue. (2T 98:13–99:22) "We knew who Lattanzio was. We all knew who Black Diamond was. This was just meant to save time explaining who the other parties were." (2T 99:20–22) Lattanzio and Black Diamond, Beach explained, were the ones who took his money. And in the memo Lattanzio did indeed head the list of "proposed defendants." (2T 99:23–100: 8) The weight to be given Beach's testimony, in any event, was for the jury to decide.

The "funding side" fraud was not proven, and under the Rule 29(c) standard, the evidence of it must be interpreted in the light most favorable to the prosecution. But even if proven, it would not undercut the basis for the jury's verdict.

### 3. Montesanti

Pasquale Montesanti acted as a sort of finder or go-between for Lattanzio and Black Diamond. As such, he was in communication with both the funding side and the investors, BCM and HEI. He also regularly proposed other transactions. The defense went to considerable lengths to demonstrate that Montesanti made misrepresentations, and that certain documents (for example the HEI due diligence questionnaire) were actually emailed by Montesanti. The questionnaire arrived, however, in response to Meroney's request to Lattanzio for more information. The questionnaire also dovetails with oral representations made by Lattanzio himself, and with the IMA (G 302), the origin of which is not questioned.

Lattanzio now argues that it is "clear" that the person on the June 2014 conference call with Meroney was Montesanti, not Lattanzio. Meroney himself, however, disagreed. (1T 99:7–17). The jury was not required to accept the

hypothesis that the person identifying himself as Lattanzio was in fact Montesanti. This was sheer speculation, not evidence.

There was ample evidence from which the jury could have concluded that Lattanzio and Montesanti were working hand in glove. At any rate, however, I have highlighted actions and communications attributed to Lattanzio himself, which are more than adequate to support the conviction.

### 4. Residential "mortgage"

Lattanzio attempts to argue that his use of HEI's money to purchase his personal residence fell within the investment guidelines of HEI's investment management agreement, or IMA. (G 302) The IMA states that deposits "will be held in investment grade fixed income financial instruments as a riskless principal. . . . Under this proprietary strategy, the Investment Manager will purchase securities only when it simultaneously has arranged an offsetting sale of the same securities at a higher price." (*Id.* at 3–4) A mortgage, testified Lattanzio, is a fixed income financial instrument. (He ignored the rest of the hedging investment strategy.)

Lattanzio simply took and spent the money; only later did he claim it went into a mortgage. At trial, he offered only that the mortgage had been "drafted," in the amount, he "believe[d]," of $2.1 million. (8T 91:18–21) Some insight into this obfuscatory strategy may be gained from the parallel BCM situation. Then, Lattanzio told Custom House long after he had spent most of the money that he could "paper this up" with a mortgage. He then came up with a promissory note supposedly secured by his fiancée's house, and promised that the mortgage would follow "shortly." (8T 143:1–2; G 604)

An individual purchase money mortgage for a home—assuming there was one—would not be the kind of hedged investment in fixed-income securities contemplated by the IMA. It is not liquid. It constitutes gross self-dealing by an investment professional. The jury could permissibly have concluded that Lattanzio knew this, and that this is why, when Meroney asked him point blank if either of the alleged "mortgages" was on the residence of himself or his girlfriend, Lattanzio lied. (1T 78:9–23) And none of this, of

course, would account for the jewelry, the house renovations, the private school tuition, and other expenditures.

There being more than sufficient evidence of intent to defraud, the Rule 29 motion for a judgment of acquittal is denied.

## IV.    Motion for new trial

Mr. Lattanzio also moves for a new trial under Fed. R. Civ. P. 33. Compared to the Rule 29 standard, the standard under Rule 33 is more general: A court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33.

A Rule 33 motion may be based on an alleged erroneous ruling or combination of rulings at trial. Borrowing the appellate concept of harmless error, district courts have held that a new trial will be ordered only when it is "reasonably possible that such error, or combination of errors, substantially influenced the jury's decision." *United States v. Crim,* 561 F. Supp. 2d 530, 533 (E.D. Pa. 2008) (citing *U.S. v. Copple,* 24 F.3d 535, 547 n. 17 (3d Cir. 1994)), *aff'd,* 451 F. App'x 196 (3d Cir. 2011); *accord United States v. Bryant,* Crim. No. 07-267, 2009 WL 1559796 at *6 (D.N.J. May 28, 2009).

A court may also grant a new trial where the verdict was against the weight of the evidence. "However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Silveus,* 542 F.3d 993, 1004–05 (3d Cir. 2008) (quoting *United States v. Johnson,* 302 F.3d 139, 150 (3d Cir. 2002)). "Such motions are not favored and should be 'granted sparingly and only in exceptional cases.'" *Id.* at 1005 (quoting *Gov't of Virgin Islands v. Derricks,* 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted)).

### A.    Evidence of Spending

The defense moved *in limine* to exclude evidence that Lattanzio spent the victims' money on an expensive house and renovations, jewelry, cars, and other

luxuries. (ECF no. 89) Such evidence of extravagance, he argued, could only inflame the jury's class prejudices. Applying the Rule 403 balancing test, I ruled before trial that the probative value of such evidence was not substantially outweighed by the risk of unfair prejudice. (ECF no. 94; transcript not yet prepared) At trial, the jury heard testimony of William Stehle, the general contractor who renovated Lattanzio's new house, and Peter Wong, an FBI Forensic Accountant who analyzed Lattanzio's expenditures of the victims' funds.

Admission of lifestyle evidence carries a danger of appealing to class resentments, and so requires the weighing of probativeness against prejudice. "The problem with a general rule of permitting evidence of an affluent lifestyle to show 'motive' for committing a crime is that it ignores the real possibility that the extreme or extravagant wealth or spending was made possible by legitimate means and, if so, the introduction of such evidence would appeal solely to class prejudice. Therefore, the real issue is whether the relevance of motive is outweighed by unfair prejudice as contemplated by Fed. R. Evid. 403 and the due process clause of the Fifth Amendment." *United States v. Jackson-Randolph*, 282 F.3d 369, 378 (6th Cir. 2002). "Use of a defendant's wealth to appeal to class bias can be highly improper and can deprive that defendant of a fair trial. But evidence of wealth or extravagant spending may be admissible when relevant to issues in the case and where other evidence supports a finding of guilt." *United States v. Williams*, 705 F. App'x 869, 873–74 (11th Cir. 2017) (internal quotation marks and citation omitted) (citing *United States v. Bradley*, 644 F.3d 1213, 1271 (11th Cir. 2011)). *See also United States v. Ellis*, 548 F.3d 539, 543 (7th Cir. 2008) (upholding admission of evidence that the defendant, while evading $2 million in taxes, spent nearly the same amount on travel, cars, and purchasing and decorating a new home).

No simple test could adequately capture the circumstances of every case. It is instructive, however, that *Jackson-Randolph* looked to whether (1) there is credible evidence, direct or circumstantial, of the illegal activity; (2) the money

spent was not available to the defendant from a legitimate source; and (3) the accumulation of great wealth or extravagant spending related to the period of the alleged illegal activity. *Jackson-Randolph*, 282 F.3d at 378 *Id.*

This case did not present the high danger of appealing solely to class prejudice that was identified in *Jackson-Randolph*. There was strong independent evidence of guilt, and the evidence of expenditures was not mere "lifestyle" evidence. It was specific to and contemporaneous with the offenses charged; it concededly involved the use of the investors' money; and it was highly probative of guilt. It went directly to Lattanzio's fraudulent intent, the key issue in the case. It tended to demonstrate that this was not some sort of good faith error, but purposeful conduct motivated by greed. In addition, the charges required proof that the defendant took the investors' money for specified purposes, and then used it for other purposes. Proof of those other purposes required evidence of what the money was in fact used for.

Even in a case where expenditures are not so directly relevant, courts have permitted evidence of extravagant expenditures as proof of motive:

> "Motive is always relevant in a criminal case, even if it is not an element of the crime." *United States v. Hill*, 643 F.3d 807, 843 (11th Cir. 2011) (alteration omitted) (quoting *United States v. Sriyuth*, 98 F.3d 739, 747 n.12 (3d Cir. 1996)).

*Williams*, 705 F. App'x at 873–74. Here, the motive was not some generic desire for money, which might be said of any fraud case. By his own account, Lattanzio had made no income (other than Social Security) in the five years preceding the fraud, and was in financial straits. He also felt an emotional urgency to buy gifts, such as the car and diamond ring, to thank his fiancée, who had supported him. (8T 73:6–12) Although he apparently presented these as sympathy factors, they also strongly suggested a motive to commit an intentional fraud.

*United States v. Abdulwahab*, No. 3:10CR248, 2016 WL 2349109 (E.D. Va. May 3, 2016), *app. dismissed*, 671 F. App'x 206 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 2141 (2017), exemplifies my approach here. There, the court

considered whether counsel was ineffective for failing to exclude evidence of the defendant's personal spending. That defendant promised investors their money would be held in escrow, but spent it on cars, jewelry, and the like. The court, applying a Rule 401/403 analysis, found the evidence admissible "as proof that Abdulwahab had made deliberate misrepresentations to investors concerning how their invested money would be used." 2016 WL 2349109 at *7. In addition, the court held that the evidence was admissible to prove motive:

> [E]vidence of lavish spending is "clearly probative of [the defendant's] motive (e.g., wealth accumulation and maintenance)." *United States v. Cole*, 631 F.3d 146, 155 (4th Cir. 2011); *see also United States v. Shelburne*, No. 2:06CR00023, 2008 WL 474094, at *2-3 (W.D. Va. Feb. 21, 2008 (collecting cases and finding that evidence of lavish spending could be admitted under Rules 403 and 404(b) "to demonstrate the defendant's motive-greed").

*Id.* A similar analysis would apply to the parallel facts in this case. *See also United States v. Staton,* 2012 WL 2036045  (E.D. Pa. June 5, 2012) (on 404(b)/403 analysis, admitting financial records to "directly prove" the intent or knowledge elements of the charged offenses because they revealed "that Defendant spent the [victim's] money ... on personal expenses, such as expensive cars, vacations and other luxury items, rather than on paying off the old lease agreements on behalf of the victims, as offered.")[9]

In denying the motion *in limine*, I considered the nature, as well as the amount, of the expenditures. While the dollar amounts were high, nothing about the items purchased was inflammatory, prejudicial, or suggestive of bad acts extrinsic to the charged offenses. *See United States v. Hoey*, No. 16-2738-CR, 2018 WL 1211826, at *2 (2d Cir. Mar. 8, 2018) (in case of wire fraud and embezzlement from pension fund, upholding ruling that "while evidence of [defendant]'s lavish spending habits would be allowed, evidence of his spending on illegal activities (e.g., drugs and prostitutes) would be barred. [Defendant]'s

---

[9]     Indeed, the Court is hard pressed to recall a white-collar case in which the prosecution did *not* state that the defendant used the proceeds of the offense "to finance a lavish lifestyle." But excessive reliance on clichés is not grounds for exclusion of evidence.

spending habits coupled with the depletion of the Company's funds due to financial struggles was highly probative of [defendant]'s motive for taking money from the Plan and was used to rebut [defendant]'s defense that he had a good faith belief that the money he took was being used for the benefit of the Plan beneficiaries.")

In denying the motion *in limine,* I also cautioned the prosecution that I would not permit the evidence of expenditures to be presented in a dramatic or inflammatory manner. And I did police the presentation, *sua sponte,* starting from the very first piece of expenditure evidence, involving the diamond ring:

> Q. And based on that -- the description there, what is the item that was purchased in this transaction?
>
> A. It was a diamond ring that was purchased, bezel-set with three other diamonds.
>
> Q. Okay. And three separate diamonds, but was it one ring?
>
> A. Yes, one ring.
>
> Q. And what was the approximate weight of each of those three diamonds?
>
> THE COURT: Move on. We've got the price and we see where the money went. Let's move on.

(4T 148:3–12) The government took the hint and presented the remainder of the expenditure evidence in a fairly dry and clinical manner, with dates, dollar amounts, and minimal descriptions.

Finally, without objection, I included in my charge to the jury the following instruction as to the proper use of this evidence:

> Evidence of spending.
>
> You have heard evidence during the trial about various spending by the defendant. I instruct you that the nature of the items he purchased and the amount of money he spent on those items do not, in and of themselves, make the defendant guilty of the crimes charged. You'll remember I instructed you that you

must not be biased by such considerations as a person's wealth.[10] And that also applies to spending. You may consider this evidence for its proper purpose but you must do so without prejudice or bias.

I instruct you that you may consider -- sorry. I instruct you that you may consider this evidence -- how the defendant spent the money, when the defendant spent the money and what the defendant purchased with the money – in evaluating the defendant's state of mind. In other words, you may consider this evidence in determining whether the defendant made certain misrepresentations to BCM Energy, Inc. and HEI Investments, LLC, whether the defendant acted with fraudulent intent and whether the defendant acted with a particular motive.

(ECF no. 142, 2/13/2018 Tr. 198:16–199:10)

In short, the evidence was highly probative, but not particularly inflammatory; it was presented in a neutral manner; and the court gave appropriate instructions as to the proper purposes for which it could be considered. It was properly admitted under Fed. R. Evid. 401 and 403.

### B.     Reverse 404(b)

Lattanzio argues that the court erred in preventing him from introducing evidence of prior crimes, frauds, and bad acts of third parties Tom Thresher, James Helfer, Pasquale Montesanti, and others. I granted the government's motion *in limine* as to the following:

(1) Montesanti's 2005 California convictions for unlawfully subleasing motor vehicles and for submitting a fake tax return to a bank;

(2) evidence of a 2014 FBI investigation of Thresher, Montesanti and others regarding an unrelated transaction;

---

[10]     The reference is to the standard impartiality charge, delivered earlier, that "[y]ou should also not be influenced by any person's race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community." (ECF no. 142, 2/13/2018 Tr. 169:25–170:3)

(3) Helfer's 2013 conviction for fraud (*See* ECF nos. 103 & 101)[11]

(4) evidence of an Oklahoma securities-related civil enforcement investigation in 2009–12, involving Thresher and others.[12]

This evidence, he says, was admissible as "reverse 404(b)" material—proof of bad acts by others that tends to disprove the guilt of the defendant.

The reverse 404(b) issue was thoroughly discussed in my opinion, filed during the trial, granting the government's motion *in limine*. (ECF no. 110) That opinion is incorporated by reference here, and I will not repeat the analysis. On review, I believe it accurately states the law and fairly applies it to the facts. And even if erroneous, it could not have affected the result.

At trial, the defendant was given sufficient leeway to present his defense—which in my view was not really a defense at all—that there was fraud on the funding side. He extensively cross-examined Beach and Meroney on the subject, and introduced a large volume of emails and other evidence. He presented Helfer and Thresher as defense witnesses, and impeached Helfer's credibility with a prior fraud conviction and related parole violations that were within the Rule 609 lookback period. (8T 21:21 *et seq.*)

The motion for a new trial on reverse 404(b) grounds is denied, essentially for the reasons stated in my prior opinion (ECF no. 110).

## C.    Missing Witness Instruction

The defense subpoenaed Pasquale Montesanti as a witness. Through counsel, Montesanti declined to testify, asserting his Fifth Amendment privilege against self-incrimination. (6T 14:2–17:24; 7T 6:13–7:4; Court Ex. C-1) As to Montesanti, Lattanzio sought a "missing witness" jury instruction—*i.e.,* an instruction that, where a witness is peculiarly available to one party but was not called, the jury may presume that the witness's testimony would have been

---

[11]    I did permit the defense to use Helfer's prior conviction for the limited purpose of impeaching his credibility when the defense called Helfer as a witness. (*See* 8T 21:21 *et seq.*)

[12]    This fourth matter was highlighted in a motion for reconsideration. (ECF no. 108) After thorough oral argument, I denied that motion in a brief oral ruling, for the reasons previously stated. (6T 33:7–34:2)

unfavorable to that party.[13] I denied the request. In my oral ruling, I gave several reasons:

      (a) Montesanti had invoked his Fifth Amendment privilege, and hence was not peculiarly available to one side, but was equally unavailable to both.

      (b) The government's power to seek immunity does not render a witness available.

      (c) Montesanti's interview by the FBI occurred pursuant to a proffer agreement that preserved his Fifth Amendment privilege and did not render him available to testify.

      (d) Defense counsel, with the benefit of FBI 302 reports of Montesanti's interviews, did not point to any statements exculpatory of Lattanzio, but merely stated a desire to cross-examine Montesanti.

(ECF no. 142, 2/13/2018 Tr. 10:7–13:20)

      I believe the ruling was correct, for the following reasons.

---

[13]    4.16   Missing Witness

    You have heard evidence about (name of missing witness), who has not been called to testify. The defense has argued that (name of missing witness)'s testimony could have been important to this case and that (name of missing witness) was available as a witness only to the government and not to the defense.

    If you find that the government could have called (name of missing witness) as a witness and that (name of missing witness) would have given important new testimony, and you also find that (name of missing witness) was available as a witness only to the government and not to the defense and that the government failed to call (name of missing witness), you are permitted, but you are not required, to infer that (name of missing witness)'s testimony would have been unfavorable to the government.

    You must decide whether you believe that (name of missing witness) would have testified unfavorably to the government. You should not draw such a conclusion if the witness was equally available to both parties or if the witness' testimony would have merely repeated the testimony of other witnesses or evidence already presented in the case.

3d Cir. Model Jury Instructions (Criminal) 4.16.

In adopting the missing witness instruction, the relevant Third Circuit committee cited established case law stating the four prerequisites for such an instruction:

> The witness was available to one party and not the other;
>
> The party to whom the witness is available does not call the witness and provides no explanation for that failure;
>
> The witness is not prejudiced against that party; and
>
> The witness would give relevant and non-cumulative testimony.
>
> See United States v. Ariza-Ibarra, 651 F.2d 2, 15-16 (1st Cir. 1981); United States v. Adigun, [998] F. Supp. 2d [356,] 2014 WL 644456 (M.D. Pa. 2014) (discussing when to give missing witness instruction at defendant's request) [, aff'd, 609 F. App'x 718 (3d Cir. 2015)].

Third Circuit Model Jury Instructions (Criminal) 4.16, Commentary. Those prerequisites were not satisfied here.

The chief threshold question, of course, concerns the nature of the witness's unavailability. If the witness is equally unavailable to both sides, the instruction should not be given. See United States v. Henries, 98 F. App'x 164, 166 (3d Cir. 2004) ("[A] missing witness instruction is not appropriate when a witness is equally available (or equally unavailable) to both parties."); United States v. Busic, 587 F.2d 577, 586 (3d Cir. 1978) (holding that "where neither the government nor the defendant calls a witness who is available to both, the 'missing witness' instruction does not properly lie.").

Montesanti asserted his Fifth Amendment privilege against self-incrimination, and declined to testify. The case law establishes that a witness who asserts the privilege is not peculiarly available to one side, but is equally unavailable to both, so a missing-witness instruction is not warranted. See Adigun, 998 F. Supp. 2d at 367 ("[S]everal cases have generally held that a witness' invocation of his Fifth Amendment privilege does not require a missing

witness jury instruction because such an invocation renders the witness unavailable to both parties.")

That the government could seek an order of immunity does not render a witness who asserts the Fifth Amendment privilege "available" to the government. If that were so, then presumably every witness who took the Fifth would be deemed available. The case law is resoundingly to the contrary: "[E]very circuit to have considered this question has held that the government's mere ability to grant immunity, without more, does not make a witness who invokes the Fifth Amendment right not to testify peculiarly available to the government within the meaning of the missing instruction witness rule." *United States v. Raphael*, 487 F. App'x 490, 500 (11th Cir. 2012) (citing *United States v. Rios*, 636 F.3d 168, 171 (5th Cir. 2011); *United States v. Myerson*, 18 F.3d 153, 158–60 (2d Cir. 1994); *United States v. St. Michael's Credit Union*, 880 F.2d 579, 597–98 (1st Cir. 1989); *United States v. Brutzman*, 731 F.2d 1449, 1453-54 (9th Cir. 1984); *United States v. Flomenhoft*, 714 F.2d 708, 713–14 (7th Cir. 1983); *United States v. Simmons*, 663 F.2d 107, 108 (D.C. Cir. 1979)).

Lattanzio points out that Montesanti was debriefed by the government under a proffer agreement. It is undisputed, however, that the proffer agreement preserved the privilege and barred the government from using his statements. Montesanti did not sign a plea agreement, resolve potential charges against himself, agree to cooperate, obtain a grant of immunity, or waive his Fifth Amendment privilege. (*See* 6T 18:11–19:12) His privilege not to testify remains intact, and the government cannot use his prior statements in evidence.

At oral argument, I raised the distinct due process issue of compelled immunity, and gave the government until the following morning to formulate a position. The government declined to immunize Montesanti, a matter within their prosecutorial discretion.

"To prove a due process violation on the basis of the Government's refusal to immunize a defense witness, the defendant must show the following

33

five elements[:] '[1] immunity must be properly sought in the district court; [2] the defense witness must be available to testify; [3] the proffered testimony must be clearly exculpatory; [4] the testimony must be essential; and [5] there must be no strong governmental interests which countervail against a grant of immunity.'" *United States v. Quinn*, 728 F.3d 243, 262 (3d Cir. 2013) (quoting *Government of the Virgin Islands v. Smith*, 615 F.2d 964, 972 (3d Cir.1980)).

I ruled that those foundational requirements were not present. (6T 19:1–12; 7T 3:3–4:11) Counsel, with the benefit of 302 reports of interviews of Montesanti, did not proffer anything remotely exculpatory. As stated above, the defense's theory that there was fraud on the funding side of the transaction was not in itself effective as a means of exculpating Lattanzio. There was nothing in the record sufficient to overcome the government's interest in withholding immunity.

For all of the foregoing reasons, the Court adheres to its prior rulings. There was no error in the court's denial of a missing witness instruction.

### D. Weight of the Evidence

The standard for a new trial based on the weight of the evidence is lower than that for a judgment of acquittal based on insufficiency of the evidence. Still, such a motion is "not favored," and will be granted "sparingly and only in exceptional cases." *Silveus*, 542 F.3d at 1004–05 (3d Cir. 2008).

The evidence, reviewed above, was very strong indeed. There is no need to review it again here. It does not approach the "exceptional" threshold of requiring Rule 33 relief.

### CONCLUSION

To be clear, I have considered the defendant's claims of error singly and in combination. Individually or cumulatively, they do not suggest any prejudice, unfairness, or evidentiary insufficiency that would warrant a new trial or judgment of acquittal.

For the foregoing reasons, the post-trial motions (ECF nos. 135, 143, 146) of the defendant, Nicholas Lattanzio, for a judgment of acquittal, pursuant

to Federal Rule of Criminal Procedure 29(c), or in the alternative for a new trial, pursuant to Federal Rule of Criminal Procedure 33, are **DENIED**. An appropriate Order will be filed with this Opinion.

Dated: April 16, 2018

**KEVIN MCNULTY**
**United States District Judge**